UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| JOSHUA BRITTON, | ) | |
| | ) | |
| | ) | 2:16-CV-274 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NANCY BERRYHILL, ACTING | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the United States Magistrate Judge, with the consent of the parties and an order of reference under 28 U.S.C. § 636 [Doc. 15], for decision and entry of judgment. Plaintiff's application for disability insurance benefits was administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. This is an action for judicial review of the Commissioner's final decision, per 42 U.S.C. § 405(g). Each party filed a dispositive motion [Docs. 16 and 18] with a supporting memorandum [Docs. 17 and 19].

**I.     Standard of Review**

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Servs.*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury.

1

*Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health & Human Servs.*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## II.     Sequential Evaluation Process

The applicable administrative regulations require the Commissioner to utilize a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
>
> 5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4). A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.,* 109 F.3d 270, 274 (6th Cir. 1997). The burden shifts to the Commissioner with respect to the fifth step if the claimant satisfies the first four steps of the process. See *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

### III.     Background and Procedural History

Plaintiff was born in 1991 and was a younger person under the applicable regulations at the time he filed his application (Tr. 26). Plaintiff's prior relevant work experience includes fast food cook (DOT 313.374-010, light, unskilled), fast food worker (DOT 311.472-010, light, unskilled), diesel mechanic (DOT 625.281-010, heavy, skilled), fork lift operator (DOT 921.683-050, medium, semi-skilled), and patient care attendant (DOT 354.377-014, medium, semi-skilled) (Tr. 16-17). He alleges that he became disabled on September 9, 2013, due to epilepsy and possible grand mal seizures (Tr. 27). He met the insured status requirement through June 30, 2017 (Tr. 12). Accordingly, he must establish disability on or before that date in order to be entitled to benefits. 20 C.F.R. § 404.130.

In July 2015, an ALJ conducted an evidentiary hearing at which Plaintiff and a vocational expert ("VE") testified. The ALJ found Plaintiff was not disabled under the Act and denied benefits. The appeals council denied a review request (Tr. 1). Plaintiff now appeals to this Court.

### IV.     Evidence in the Record

The Commissioner's brief accurately summarizes the medical evidence in this case:

On August 20, 2013, Plaintiff presented to the emergency room for possible seizures after an earlier work injury (Tr. 231-32). A brain CT was negative (Tr. 233, 239). On Plaintiff's alleged onset date, September 9, 2013, he was taken to the hospital after having a seizure at work (Tr. 263, 270). A head CT was negative (Tr. 276). The following day, Plaintiff met with neurologist, Stephen Kimbrough, M.D. (Tr. 304-06). Plaintiff reported having seven seizures since his work injury (Tr. 304). Plaintiff appeared alert, oriented, and fully interactive with good memory (Tr. 305). He retained normal gait, strength, and sensations (Tr. 305). Dr.

Kimbrough indicated that Plaintiff's history was very suggestive of generalized tonic-clonic seizures with two unremarkable CTs (Tr. 306). The doctor advised Plaintiff to not drive or work with heavy machinery (Tr. 306). Subsequent EEGs and a brain MRI were normal (Tr. 254, 256, 358-59).

Plaintiff returned to Dr. Kimbrough in October 2013 with reports of continued seizures (Tr. 309). The doctor noted the normal EEGs and brain MRI (Tr. 309). Plaintiff appeared alert and oriented with a normal mental status and good memory (Tr. 309). He had a normal gait (Tr. 310). Dr. Kimbrough was suspicious of pseudoseizures based on the negative objective workup (Tr. 310). Plaintiff was to avoid driving and working with heavy machinery (Tr. 310). Plaintiff was supposed to follow up in two to three months, but he never returned (Tr. 310).

In November 2013, Plaintiff began seeing Arvo Kanna, M.D. (Tr. 335). He reported having at least 10 seizures since August 2013, but they had decreased with medication (Tr. 336). Plaintiff retained a normal gait and tandem walk, full strength, and intact sensation and coordination (Tr. 339-40). Plaintiff was oriented with normal memory, attention span, concentration, insight, and judgment (Tr. 340). Dr. Kanna changed Plaintiff's medications (Tr. 340). Plaintiff returned to Dr. Kanna on December 13, 2013, and denied any seizures since December 1, 2013 (Tr. 330). On examination, Plaintiff appeared alert and oriented with intact speech, attention, concentration, insight, and judgment (Tr. 333). He retained a normal gait, full strength, and intact sensation and coordination (Tr. 333). Dr. Kanna admitted that the type of seizure had not been proven because the prior objective testing was negative (Tr. 333).

Plaintiff followed up with Dr. Kanna in January 2014 when he reported two seizures since t he last visit (Tr. 325). He denied any recent convulsions (Tr. 325). Plaintiff remained alert and oriented with intact speech, judgment, and insight (Tr. 327). Plaintiff demonstrated normal gait, strength, sensation, and coordination (Tr. 328). Dr. Kanna opined that Plaintiff was completely disabled from his former employment (Tr. 328). Plaintiff presented to the emergency room on January 11, 2014, following a seizure after vomiting all night (Tr. 369).

In February 2014, Plaintiff told Dr. Kanna that he had two seizures since his prior visit (Tr. 425). During the examination, Plaintiff had normal strength, coordination, and gait (Tr. 428). He was alert and oriented with intact speech, attention span, concentration, insight, and judgment (Tr. 427). In March 2014, Plaintiff reported to Dr. Kanna that he had only one seizure since the last visit (Tr. 420). Plaintiff admitted that he had been driving despite his allegedly disabling seizures (Tr. 420). He appeared alert and oriented with normal insight and judgment, but some memory loss (Tr. 422). He had a normal gait, full strength, and intact sensation and coordination (Tr. 422). Plaintiff told Dr. Kanna in April 2014 that he had two seizures since March 2014 (Tr. 415). Plaintiff indicated that he had been more active and doing odd jobs (Tr. 415). In May 2014, Plaintiff reported three seizures since the April 2014 appointment (Tr. 410). Dr. Kanna again noted that

no abnormalities on EEG studies, including an ambulatory 48-hour EEG (Tr. 412). Plaintiff had not been getting all of his prescribed medications because of issues with his insurance (Tr. 412-13). In July 2014, Plaintiff told Dr. Kanna that he had three seizures since May 2014 (Tr. 406).

Plaintiff returned to Dr. Kanna in October 2014 when he described seven seizures since July 2014 (Tr. 386). Dr. Kanna indicated that Plaintiff needed a four-day video EEG to confirm the type of seizures and the appropriate treatment (Tr. 389, 400). Plaintiff followed up in February 2015, but he had not gotten the EEG yet (Tr. 395). Plaintiff was alert with normal speech, attention span, concentration, and memory (Tr. 397). He retained a normal gait, full strength, and intact coordination (Tr. 397). Dr. Kanna admitted he did not know if Plaintiff's seizures were non-epileptic (Tr. 398). Plaintiff saw Dr. Kanna in March 2015 for laboratory results and his medications were changed (Tr. 391, 393). Two months later, Dr. Kanna completed a check-mark box form indicating that Plaintiff's seizures caused severe interference with daily activities and would likely disrupt the work of co-workers, and Plaintiff would need additional supervision and could not work at heights, work with power machines, or operate motor vehicles (Tr. 447-48). Plaintiff would miss six or more days of work a month (Tr. 448).

In June 2015, Sam Kabbani, M.D., performed an independent medical evaluation for Plaintiff's workers' compensation claim (Tr. 449-51). Dr. Kabbani noted that Plaintiff's head/brain CTs and MRIs were negative, and the EEGs were normal (Tr. 450-51). Plaintiff's cognition remained intact and he exhibited a normal gait, full strength, and intact sensation (Tr. 451). Dr. Kabbani recommended a 72-hour ambulatory EEG (Tr. 451). The doctor assessed Plaintiff with a 29 percent whole-person impairment (Tr. 449).

State agency medical consultants reviewed the medical records. In November 20, 2013, Maria Gumbinas, M.D., reviewed the medical records and found that Plaintiff must avoid exposure to hazards and could not climb ladders, ropes, or scaffolds (Tr. 40-43). In March 2014, Marvin Cohn, M.D., reviewed the updated records and affirmed Dr. Gumbinas's opinion (Tr. 62- 65).

Plaintiff testified at the administrative hearing on July 9, 2015 (Tr. 25-36). Plaintiff indicated he was injured at work when he was struck in the head and lost consciousness (Tr. 28, 32-33). He subsequently began having seizures (Tr. 28). Plaintiff testified that it took him one to two days to feel normal after a seizure (Tr. 30). Plaintiff had a pending workers' compensation claim (Tr. 31).

Donna Bardsley, a vocational expert, also testified at the administrative hearing in response to a hypothetical question assuming an individual limited to light work without exposure to hazards or climbing ladders, ropes, or scaffolds (Tr. 34). The vocational expert testified that such a person could perform Plaintiff's past relevant work as a fast food worker (Tr. 33-34). The vocational expert also indicated that the person could perform work as a ticket seller (90,000 positions

nationally), a rental clerk (113,000 positions nationally), and a cashier (1,150,000 positions nationally) (Tr. 34).

## V. The ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through June 30, 2017 (Tr. 10). The ALJ also found that Plaintiff had not engaged in substantial gainful activity since September 9, 2013, the alleged onset date (Tr. 12). The ALJ found Plaintiff had a severe impairment of seizure disorder (Tr. 12).

The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpt. P, App'x 1 (20 C.F.R. § 404.1520(d), 416.920(d)). The ALJ noted that there were "insufficient findings on either examination or diagnostic test workup to confirm the presence" of a listed impairment to satisfy the listed criteria (Tr. 13).

The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with the limitation that Plaintiff could not climb ladders, ropes, or scaffolds, and should avoid exposure to hazards (Tr. 13). The ALJ noted that while Plaintiff's postical manifestations lasted one to two days, only minimal treatment was needed in terms of regular appointments with a neurologist (Tr. 15). Describing his daily living activities, Plaintiff reported that he watched TV, talked with his girlfriend, parents, and friends, spent time with others, and travelled, among other things (Tr. 15). The ALJ noted the medical evidence did not support the degree of limitations alleged by Plaintiff (Tr. 15).

The ALJ noted that the medical records did not support Plaintiff's allegations of disability. In making that finding, the ALJ noted that Plaintiff engaged in a number of activities, as outlined above. The ALJ also noted that Plaintiff's neurological exams have been essentially normal, with

all EEGs and CT scans being negative (Tr. 14). He also indicated that Plaintiff's motor strength was normal, as were his reflexes and gait (Tr. 15).

The ALJ considered the opinions of the State Agency physicians and gave their opinions some weight as partially consistent with the medical record (Tr. 15). The ALJ determined the State Agency consultants were not restrictive enough, as the ALJ limited Plaintiff to light work (Tr. 15). The ALJ gave the opinion of Plaintiff's treating physician, Dr. Kanna, that Plaintiff was disabled from his former employment little weight because his opinion was in reference to his prior employment. He also noted that Dr. Kanna just started treating Plaintiff in November 2013 and the neurological examinations were essentially normal. (Tr. 16). The ALJ gave Dr. Kanna's seizure questionnaire some weight as partially consistent with the overall record (Tr. 16). The ALJ stated that Dr. Kanna's opinion that Plaintiff would be likely absent for four to six days per month for treatment was not well-supported because the record reflects only minimal treatment (Tr. 16). Additionally, all EEGs and CT scans and MRIs of the head were negative (Tr. 16). Dr. Kanna reports that Plaintiff has severe difficulty with activities of daily living, but the ALJ felt this opinion was not supported by Dr. Kanna's own treatment records or with Plaintiff's reported daily living activities.

The ALJ considered the disability rating assigned by Dr. Sam Kabbani, who performed an independent medical evaluation for Plaintiff's workers' compensation claim, but gave the rating little weight, since Dr. Kabbani did not give any specific limitations (Tr. 16).

After determining that based on all of the medical evidence, Plaintiff had a RFC to perform light work with the limitations noted, the ALJ determined, based on the testimony of the VE, that Plaintiff was able to perform his past work as a fast food worker. This ended the five-step analysis.

## VI.     Analysis

Plaintiff alleges three specific issues: First, Plaintiff alleges the ALJ erred by not affording controlling weight to the opinion of treating physician Dr. Arvo Kanna; second, Plaintiff says the testimony of the VE suggests a finding that there is no work in the national economy that Plaintiff can perform; and third, Plaintiff alleges the ALJ made a flawed credibility determination with regard to Plaintiff. The Court will first examine whether the ALJ properly proceeded through the sequential process in evaluating Plaintiff's claim.  The Court begins at step three.

### A.     The ALJ's finding that Plaintiff's epilepsy does not meet a Listed Impairment

The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In other words, a claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits. "An [ALJ] must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir. 2011).

In *Reynolds,* the Sixth Circuit remanded the case where the ALJ failed to analyze Reynolds physical condition in relation to the Listed Impairments. "Put simply, he skipped an entire step of the necessary analysis. He was required to assess whether Reynolds met or equaled a Listed Impairment (such as the one above), but did not do so. Admittedly, Reynolds did not raise this specific objection to the decision below, and generally arguments not raised are abandoned. However, this rule is prudential and not jurisdictional…." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) citing *Dorris v. Absher,* 179 F.3d 420, 425 (6th Cir.1999). The

Sixth Circuit noted that this requirement for specific objections may be excused "in the interest of justice." *Id.* citing *Kelly v. Withrow,* 25 F.3d 363, 366 (6th Cir.1994).

Under Listing 11.02 Epilepsy—convulsive epilepsy, (grand mal or psychomotor), seizures must be "documented by detailed description of a typical seizure pattern, including all associated phenomena." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.02. Further, seizures must occur more than once a month and "in spite of at least 3 months of prescribed treatment[.]" *Id.* Similarly, under Listing 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), seizures must be "documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." *Id.* at 11.03. To satisfy 11.03, seizures should include "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." *Id.* The Listings instruct that the "degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures ... Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available." *Id.* at 11.00(A). The Listings also make clear that 11.02 and 11.03 will only apply "if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy." *Id.* The Listings instruct that "[e]valuation of the severity of the impairment must include consideration of the serum drug levels." *Id.* In this regard, "[s]hould serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption of metabolism of the drug. Blood drug

levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance." *Id*.

In this case, the ALJ barely touched on this issue. "There are insufficient findings on either examination or diagnosis test workup to confirm the presence of an impairment or combination of impairments which meets or equals the criteria of any impairment listed therein." (Tr. 13). Dr. Kanna diagnosed Plaintiff with generalized complex partial epilepsy with intractable epilepsy. She also noted generalized convulsive epilepsy with intractable epilepsy (Tr. 443). Dr. Kanna completed the seizure questionnaire and indicated her diagnosis was generalized complex partial epilepsy with intractable epilepsy (345.4). He noted two or more seizures per month, lasting between two and five minutes, that the postictal manifestations included confusion, exhaustion, irritability, and severe headache, and that these manifestations will last 24 hours or more after the seizure. He noted Plaintiff was compliant with his medication. (Tr. 447-48). The ALJ did not analyze the listed impairments to determine whether Plaintiff satisfied its criteria. That was required and the Court finds that the case should be remanded on that ground alone.

**B.     The ALJ's evaluation of Plaintiff's treating physician, Dr. Arvo Kanna**

There is no dispute that Dr. Arvo Kanna is Plaintiff's treating physician. Plaintiff's argument claims that the ALJ did not follow the treating physician rule. The "treating physician rule" requires the ALJ to give controlling weight to the opinions of treating physicians because:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (quoting 20 C.F.R. § 404.1527(d)(2). The ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "not

inconsistent with the other substantial evidence in [the] case record." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)). However, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *2 (July 2, 1996).

The Sixth Circuit has also explained that "[t]his court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions received great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." *Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464,472 (6th Cir. 2014). It is the function of the ALJ to resolve the conflicts between the medical opinions. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 588 (6th Cir. 2013) ("In a battle of the experts, the agency decides who wins.").

If the ALJ declines to give controlling weight to a treating opinion, the ALJ must still determine how much weight is appropriate by considering various factors, including the length of the treatment relationship and the frequency of exams, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. See *Wilson*, 378 F.3d at 544; see also 20 C.F.R. § 404.1527(c)(2). The regulations require the Commissioner to "always give good reasons in [the] notice of determination or decision for the weight" afforded to the opinion of the claimant's treating sources. 20 C.F.R. § 404.1527(c)(2). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96–2p, 1996 WL 374188 at *5 (July 2, 1996).

In the present case, the ALJ declined to give Dr. Kanna's opinion controlling weight. The reason he declined to give controlling weight to Dr. Kanna was because "neurological examinations were essentially normal and all EEGs and CT scans and MRIs of the head were negative." (Tr. 16). He also notes his opinion that Plaintiff would be absent from work four to six days a month was not supported by the benign medical findings. In many cases, that conclusion would be supported by the lack of medical findings. In regards to this specific condition – seizure disorder and epilepsy diagnosis – it is not so clear. Dr. Kanna was aware of the essentially normal EEGs and CT scans and yet diagnosed him with a generalized epilepsy disorder that was intractable. For the ALJ to conclude that he does not suffer from that because of the negative EEGs and CT scans seems to take on the role of physician. It very well may be that these tests results can be read to mean Plaintiff does not suffer from epilepsy as Dr. Kanna has opined. But there is nothing in the record that suggests that – other than the ALJ's assumption. Further, the State agency medical consultants rendered their opinions in November 2013 and March 2014, that did not include all of Dr. Kanna's treatment records. For this reason, the Court finds that good reasons have not been offered to discount the opinion of Dr. Kanna in this instance. Remand is necessary on this point for further consideration.

**VII.    Conclusion**

Based upon the above findings, Plaintiff's Motion for Summary Judgment [Doc. 16] is GRANTED, and the Commissioner's Motion for Summary Judgment [Doc. 18] is DENIED. This case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further proceedings consistent with this Memorandum Opinion.

SO ORDERED:

s/Clifton L. Corker
United States Magistrate Judge